**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**FORT MYERS DIVISION**

FILED

**PRODUCTS BY KENDALL, INC.,** a
Florida corporation,

**Plaintiff,**

vs.                                                    Case No.

**DRI-DEK CORPORATION,** a Florida
corporation, and **QUEST**               2:13-cv-330-FtM-99SPC
**EDUCATIONAL FOUNDATION,**
**INC.,** a Florida corporation, **QUEST**
**FOR COLLIER COUNTY, INC.,** a
Florida corporation.

**Defendants.**
_____/

## COMPLAINT FOR DAMAGES, AND DECLARATORY RELIEF

Plaintiff, PRODUCTS BY KENDALL, INC., a Florida corporation ("Kendall")

hereby files this, its Complaint for Damages, and Declaratory Relief against Defendants, DRI-

DEK CORPORATION ("DDC"), QUEST FOR COLLIER COUNTY, INC. ("Quest"), and

Defendant, QUEST EDUCATIONAL FOUNDATION ("Quest Foundation") and alleges as

follows:

## JURISDICTION, PARTIES AND VENUE

1.      This is an action that arises, *inter alia*, under the trademark laws of the United

States, at Title 15 of the United States Code, and more particularly, 15 U.S.C. § 1114, *et seq.*

2.      This Court has federal question subject matter jurisdiction over this action

under the provisions of 15 U.S.C.A. § 1121 (Lanham Act), 28 U.S.C.A. § 1331, and 28

U.S.C.A. § 1338, because the complaint alleges violations of, and disputes governed by, federal trademark, dilution, and unfair competition laws.

3.   To the extent this Court lacks original jurisdiction under 28 U.S.C.A. § 1332(a) to hear any claim asserted herein, the Court has supplemental jurisdiction over the claim pursuant to 28 U.S.C.A. § 1367(a), and pursuant to the Declaratory Judgment Act, Title 28, United States Code, Section 2201.

4.   Plaintiff, Kendall, is a Florida corporation with its primary place of business in Collier County, Florida.

5.   Defendant, DDC, is a Florida corporation with its primary place of business in Collier County, Florida.

6.   Defendant, Quest, is a Florida corporation with its primary place of business in Collier County, Florida.

7.   Defendant, Quest Foundation, is a Florida corporation with its primary place of business in Collier County, Florida.

8.   This Court has personal jurisdiction over DDC, Quest, and Quest Foundation, pursuant to Fla. Stat. § 48.193, and otherwise.

9.   Venue lies in the Middle District of Florida pursuant to 28 U.S.C. Section 1391, as the Defendants reside in this judicial district, Defendants are subject to personal jurisdiction in this district, and a substantial part of the acts or omissions giving rise to the claims alleged herein occurred within this judicial district.

10.   This case is appropriately heard in the Fort Myers Division in the Middle District of Florida pursuant to Middle District Local Rule 1.02(c), as the Fort Myers Division

encompasses the counties having the greatest nexus with the causes of action and claims of Kendall alleged herein.

11.    All conditions precedent to the maintenance of this action have been performed, or have occurred.

## GENERAL ALLEGATIONS SUPPORTING REQUESTED RELIEF

### A. The Dri-Dek Product

12.    In 1981, non-party, Kendall Plastics, Inc., first registered a trademark (the "Trademark") for a product called "Dri-Dek" with the United States Patent and Trademark Office (Serial Number 73238617, Registration Number 1166624). See *Exhibit A*.

13.    Dri-Dek consists of raised tiles and accessories made of molded plastic. Dri-Dek is most frequently sold for use as flooring and shelf-liner in wet areas, and other select areas. An exemplary photograph of the Dri-Dek product is shown immediately below:



14.    Dri-Dek is, and at all relevant times has been, manufactured using an injection-molding process that requires mold tooling. Dri-Dek, at all relevant times, has been

physically manufactured by non-party, Octex Holdings, LLC, and its predecessors in interest (collectively, "Octex").

15.     In 1984, DDC was incorporated in Florida.

16.     In 1988, Kendall was incorporated in Florida.  Kendall initially sold Dri-Dek almost exclusively to distributors or resellers.

17.     Kendall primarily sold Dri-Dek to resellers under a distribution agreement with DDC, in exchange for sales commissions that DDC paid to Kendall.

18.     DDC, on the other hand, primarily sold Dri-Dek directly to end users.

19.     In 1997, DDC advised Kendall that ownership of the mold tooling for Dri-Dek had been transferred to a third-party Bahamian company purportedly located in Nassau, Bahamas, and allegedly named IRSystems, LTD ("IRS").  DDC represented that IRS owned the mold tooling, assumed the risk of products liability for Dri-Dek, and was reimbursed for the expense maintenance and any necessary replacement of the mold tooling.

20.     Until 2001, Kendall continued its sales to resellers and distributors, and DDC continued its sales to end users.

21.     By 2001, DDC then owned the above-referenced Trademark for Dri-Dek.

22.     Leading up to 2001, Kendall experienced consistent growth in Dri-Dek sales. During the same periods, DDC, on the other hand, experienced several years of overall declines in Dri-Dek sales.

23.     DDC's sole shareholder and *de facto* principal officer has been, at all relevant times, C.E. Dekko, f/k/a Chester E. Dekko, Jr., a/k/a "Tad" Dekko ("Dekko").

24.     During March of 2001, DDC represented that DDC no longer wished to sell Dri-Dek, due in substantial part to doubts about Dri-Dek's future profitability, due the potential for products liability, and due to other reasons related to the personal circumstances of DDC's principal(s) substantially immaterial to this action.  DDC further expressed to Kendall that DDC was willing to transfer its assets and intellectual property to Kendall.  DDC further represented that the amounts DDC "owed" to IRS for expenses to maintain the mold tooling and assumption of liabilities were sizable and significant.  In exchange, DDC sought to extract whatever value DDC believed remained in manufacturing the Dri-Dek product, and whatever value DDC could obtain from a sale of its Trademark(s), intellectual property, and business assets.  Correspondingly, Kendall sought to continue selling Dri-Dek, and sought to extend its superior sales growth and performance relative to DDC.

25.     In March of 2001, when DDC offered to sell its assets and to assign its Trademark to Kendall, DDC conditioned the sale upon Kendall agreeing to compensate DDC for the cost of maintenance of the mold tooling that DDC purportedly "owed" and "paid" to IRS, and for IRS ensuring the quality of Dri-Dek manufactured, as well as for the value of the Trademark and assets assigned to Kendall from DDC.

26.     Unknown to Kendall until recently, the purported arms-length relationship between DDC and IRS was entirely a misrepresentation and a fiction, as IRS itself was apparently a fiction.  Dekko has himself recently described the "relationship" between DDC and IRS in writing to his own Certified Public Accountant as "**a sham**" as set forth below.

## B. The Agreement Between Kendall and DDC

27.     On April 1, 2001, Kendall and DDC entered an agreement (the "Agreement") attached as ***Exhibit B***, under which Kendall had the option to pay a per-piece "royalty" fee for the manufacture of any Dri-Dek that it might elect to manufacture using mold tooling owned by IRS, as follows:

> "DDC does hereby grant to KP the exclusive license to manufacture or cause to be manufactured DDC's products and to exclusively sell them in the United States, its territories and all foreign countries. KP does hereby accept the license subject to the following term and conditions . . . KP shall owe DDC a royalty upon the manufacture of the products . . . Payment of royalties shall be due 45 days from the time of manufacture and shall constitute full compensation to DDC."

28.     DDC further promised under the Agreement to provide mold tooling to manufacture Dri-Dek "of sufficient quantity and quality," in the event that Kendall chose, at its option, to manufacture any Dri-Dek using mold tooling owned by IRS.  Though DDC agreed to provide mold tooling, DDC did not reserve the right to control the quality of any Dri-Dek that Kendall chose, at its option, to manufacture using mold tooling provided by IRS. Not only did DDC reserve no contractual right to control quality, but, as set forth below, shortly after the inception of the Agreement, neither DDC nor IRS ever made any meaningful effort to control quality whatsoever.

29.     Kendall agreed to purchase the Trademark and assets on a certain payment schedule in reliance on DDC's purported and misrepresented expenses paid to IRS for maintaining the mold tooling.

30.     In exchange for DDC receiving payments for expenses for mold tooling, and for ensuring the quality of mold tooling held by IRS, DDC assigned the Trademark, and transferred its domain names and web sites, and business assets to Kendall.

31.     Specifically, under the Agreement, Kendall took assignment of the Trademark, ownership of the domain name at "www.dri-dek.com," and ownership of various other assets as follows:

> "DDC grants exclusive and unrestricted use of all its currently existing electronic office equipment, warehouse equipment, shipping equipment and supplies, **trademarks, trade names**, brochures, photographs, artwork, printed material, customer databases, advertising, samples, electronically stored information, telephone numbers, **websites**, mail and email address. KP shall maintain, replace or discard the above at its own expense determined by KP's assessment of market conditions."

32.     The Agreement, though termed a "license" by the parties, operated and operates as an assignment of the Trademark to Kendall.

33.     The Agreement reserves no rights to DDC to dictate or control quality, or otherwise.

34.     The Agreement reserves no trademark rights to DDC whatsoever.

35.     The Agreement in no way restricts Kendall's use of the Trademark and the enumerated assets whatsoever.

36.     The Agreement contains no express duration, and may only be terminated on unanimous agreement of the parties' shareholders, such that it effectively provides for perpetual duration.

37.     The Agreement assigns worldwide usage rights to Kendall by assigning Kendall the right to use the Trademark in the "**United States, its territories and all foreign countries."**

38.     The Agreement allows Kendall to transfer or alienate the Trademark where it provides that Kendall may "**maintain**," "**replace**," or "**discard**," the Trademark, domain names, and other assets.

39.     The Agreement thus operated as an assignment to Kendall, by granting Kendall **"unrestricted"** use, **perpetual** use, **worldwide** use, and **"exclusive"** use of the Trademark and websites, with the right to **"maintain,"** **"replace,"** or **"discard,"** the Trademark, domain names, and other assets.

40.     As the assignee of the web sites and associated domain names formerly held by DDC, Kendall is also the current registrant and owner of the domain names and web site at "www.dri-dek.com," from which Kendall substantially markets and sells Dri-Dek.

41.     The web site at the domain "www.dri-dek.com" was designed by Kendall, and is updated and maintained at Kendall's expense.

42.     The web site at the domain "www.dri-dek.com" is widely recognized and highly valuable to Kendall as a source of thousands of individual sales, and as a marketing outlet.

43.     Under the Agreement, Kendall also took ownership of confusingly similar domain names owned or registered by DDC, such as "dri-deck.com," "dry-dek.com," "dry-deck.com," and "dri-deck.info" (hereinafter collectively the "Similar Domain Names"). DDC, per the Agreement, intentionally and deliberately redirected the Similar Domain Names to "www.dri-dek.com," such that any confusion on the part of the consuming public as to the Similar Domain Names was obviated.

## C. Lack of Quality Control

44.     After 2001, as it is now apparent, DDC had minimal business operations other than serving as a commercial property landlord, and as of the date of this filing, DDC has no

cognizable operations beyond collecting fees from Kendall for maintenance of the mold tooling.

45.    In 2002, DDC directly, or by way of IRS, paid minimal amounts for maintenance of the mold tooling, but unknown to Kendall until recently, DDC ceased doing so entirely after the inception of the Agreement.  Further, after inception of the Agreement, but substantially unknown to Kendall until recently, neither DDC nor IRS undertook any measures to control or ensure the quality of Dri-Dek.

46.    From 2001 to date, under the Agreement, Kendall has regularly and timely paid per-piece fees for the manufacture of Dri-Dek that it elects to purchase using the molds held by IRS.

47.    Surprisingly, as late as 2009, DDC attempted to claim some residual rights in the Trademark through DDC's counsel.  See *Exhibit C*.  Kendall responded that as the sole, exclusive, perpetual, unrestricted, worldwide "licensee" of the Trademark (and as the *de facto* assignee of the Trademark), and with rights to "discard" or transfer the Trademark, not even DDC could direct how Kendall used the Trademark, as DDC contracted away any and all rights to do so.  Accordingly, DDC did not pursue any purported claim to the Trademark, or press its demands, and implicitly ratified Kendall's assertion of all rights in the Trademark.

48.    DDC has neither requested, nor undertaken any effort, to control the quality of the Dri-Dek product for at least five (5) years, and Kendall is otherwise now unable to identify any substantial effort to control quality at any other time.

49.    In 2011, Kendall offered to purchase the mold-tooling from DDC, and to pay for the full and final release of any remaining residual rights that DDC errantly appeared to

claim to the Trademark, for payment of $350,000.00. Kendall's continued success in Dri-Dek sales generated fees to DDC that far exceeded DDC's value as a contractual partner in manufacturing. DDC, apparently preferring to collect payments while omitting that it had not, was not, and would not perform under the Agreement, rejected Kendall's offer.

50.   At least until 2011, upon information and belief, pursuant to the Agreement, internet traffic directed to the Similar Domain Names continued to be automatically redirected by DDC to "www.dri-dek.com." As set forth above, the intended and deliberate purpose of redirecting the Similar Domain Names to "www.dri-dek.com" was specifically to obviate any potential confusion on the part of the consuming public as to the origin of Dri-Dek. Though the Similar Domain Names were controlled by DDC or its principals, Kendall ultimately had no reason to demand direct control thereof, as the Similar Domain Names were being used per Kendall's wishes, in accordance with the intent of the Agreement, and to the benefit of both Kendall and DDC by directing internet traffic to "www.dri-dek.com" and thereby increasing sales of Dri-Dek.

51.   In 2012, Dekko initiated a separate law suit against Kendall in his personal capacity in the Circuit Court for Collier County Florida, relating in part to the purchase and sale of shares that Dekko formerly held in Kendall.

52.   In 2012, Dekko disclosed that Dekko in fact equitably owned all of IRS through a Bahamian trust administered by Butterfield Bank of the Bahamas known as "Dekko Trust II" (the "Dekko Trust"). It further came to light that the role of IRS was entirely a fiction, or "**a sham**," and IRS effectively had neither meaningful operations, nor any employees or personnel. See *Exhibit D*. (Emphasis in the original.) Instead of owing monies

to IRS as part of an arms-length transaction, DDC actually owed nothing, and reported bogus and inflated mold expenses as being paid to IRS, which then flowed through to the Dekko Trust. For example, it has come to light that DDC reported $479,167.78 in mold expenses from 1998 to 2001, while the discernible costs to physically maintain the mold tooling during the same period appears to have been less than, or approximately, $35,000. DDC reported these bogus expenses even though, to the contrary, it is now apparent that IRS undertook no actual activities whatsoever, let alone maintenance of the mold tooling.

53. In 2012, Kendall also discovered and reviewed certain financial and accounting records from DDC alluded to above. Kendall further sought out records of the actual expenses for maintenance of the mold tooling arising since 2001. Upon review of the underlying maintenance records and invoices, the expenses were moreover less than few thousand dollars per year, and it was apparent DDC's liability for "mold expenses" had been grossly overstated to Kendall, and otherwise. See composite *Exhibit E*. What is more, DDC's long-time bookkeeper and sole administrative employee has stated that she could not recall the last time DDC or IRS had paid anything for maintenance of the mold tooling, and that she had no knowledge of anyone from DDC interacting with anyone at Octex regarding manufacturing within any recent time that she could recollect.

54. The presumable purpose of the bogus and inflated mold expenses was to grossly understate DDC's income in the United States, or other purposes indiscernible. In any event, the "payments" to IRS were a fiction, as both DDC and IRS incurred little or no expense for maintenance of the mold tooling, replacement of the mold tooling, for quality control measures, or otherwise.

55.     In 2013, Kendall further discovered that the Similar Domain Names transferred to Kendall had been manipulated to redirect internet traffic and users to "www.questcollegeprep.com." Specifically, the Similar Domain Names now immediately lead to the following page wholly unrelated to Dri-Dek:



56.     The domain name "www.questcollegeprep.com" is the domain name primarily used by Quest and Quest Foundation, as affiliated entities. Quest and Quest Foundation are controlled by some or all of the same employees and principals of DDC. Ostensibly, Quest and Quest Foundation are represented to be a charity, though the actual scope of their purported charitable activities is unknown at this time. Quest, and Quest Foundation, having been given control of the Similar Domain Names by DDC, have intentionally diverted valuable internet traffic away from www.dri-dek.com in bad faith, and for purposes of

extorting Kendall. Indeed, college preparation, or educational charities, have little to nothing to do with injection molded Dri-Dek, and the manipulation of the Similar Domain Names could only be for bad faith and malicious purposes.

57.     In February and March 2013, certain of the mold tooling for Dri-Dek required material repairs as it was generating faulty product pieces, and Octex, having had no apparent meaningful interaction with DDC or IRS for a term of several years, contacted Kendall directly to address and pay the mold tooling expenses. Accordingly, Octex, the actual manufacturer of Dri-Dek, had the understanding that the origin of Dri-Dek was Kendall. It was then fully apparent that DDC had fully breached and abandoned all of its executory contractual duties under the Agreement.

58.     On April 29, 2013, based on the foregoing, Kendall contacted counsel for DDC by telephone and writing, and communicated that DDC's complete failure to perform its duties under the Agreement excused and relieved Kendall's performance, or alternatively that Kendall could terminate the Agreement on reasonable notice, and that no payments for the future manufacture of Dri-Dek would be owed going forward, or otherwise. DDC failed to agree to Kendall's interpretation of the parties' respective rights under the Agreement, such that the parties have a bona fide dispute and controversy regarding the same.

59.     All conditions precedent to the causes of action asserted herein have been satisfied, have occurred, or have been waived.

## COUNT I – BREACH OF CONTRACT
### *(Products by Kendall, Inc., v. Dri-Dek Corporation)*

60.     This count sets forth an action for breach of contract.

61.    Kendall re-alleges and incorporates by reference paragraphs 1 through 59 of this Complaint as fully set forth in this paragraph.

62.    On or about April 1, 2001, DDC and Kendall entered the Agreement.

63.    Under the Agreement, DDC "or its associated entities" are obliged to "supply, maintain and replenish all molds and/or tooling required to manufacture the products in sufficient quantity [and] quality."

64.    Under the Agreement, DDC further assigned ownership and/or granted exclusive use of all of DDC's domain names and web sites to Kendall, including the Similar Domain Names.

65.    DDC breached the Agreement at least by failing to "maintain and replenish all molds and/or tooling required to manufacture the products in sufficient quantity [and] quality." Such breaches and failures in fact resulted in the manufacture of faulty Dri-Dek pieces.

66.    DDC further breached the Agreement by transferring control or use of the Similar Domain Names to Quest and Quest Education.

67.    Kendall has been damaged at least by paying fees for maintenance of the mold tooling which did not occur, and fees for DDC ensuring the quality of Dri-Dek which did not occur.

68.    Kendall has been further damaged by the bad faith diversion of internet traffic from "www.dri-dek.com" and the Similar Domain Names assigned to Kendall.

69.    Kendall has retained undersigned counsel and is obligated to pay reasonable attorneys' fees for the legal services rendered in this action.

70.    Under the Agreement, "[a]ny action to enforce, arising out of, or relating in any way to, any of the provisions of [the] Agreement, the prevailing party shall, in addition to any other relief, be entitled to recover reasonable attorney's fees and costs."

WHEREFORE Plaintiff, Products by Kendall, Inc., respectfully requests entry of judgment against Defendant, Dri-Dek Corporation, for damages, interest, attorneys' fees and costs, and for whatever other and further relief at law or equity that the Court deems just and proper.

### COUNT II – DECLARATORY JUDGMENT
***(Products by Kendall, Inc., v. Dri-Dek Corporation)***

71.    This count sets forth an action for declaratory relief as to the parties rights under the Agreement pursuant to Title 15 of the United States Code, and more particularly, 15 U.S.C. § 1114, *et seq.*, and the Declaratory Judgment Act, 28 U.S.C.A. §§ 2201 and 2202.

72.    Kendall re-alleges and incorporates by reference paragraphs 1 through 59 of this Complaint as if fully set forth in this paragraph.

73.    After the inception of the Agreement, DDC exercised no quality control over Dri-Dek, and neither reserved nor asserted a right to exercise quality control over Dri-Dek. DDC did not and could not exercise quality control over Dri-Dek through IRS, because IRS did not exist as a practical matter.

74.    Kendall may terminate the Agreement under controlling contract law upon reasonable notice, due, in part, to the Agreement's effectively perpetual duration.

75.    Kendall's performance under the Agreement is otherwise forgiven by DDC's material breaches of the Agreement under controlling contract law.

76.    Kendall was assigned ownership of the Trademark by virtue of Kendall obtaining the sole, exclusive, perpetual, and world-wide rights in the Trademark, with rights to "discard" or otherwise transfer the Trademark, and all other property assigned and transferred under the Agreement.

77.    Kendall may lawfully sell Dri-Dek after termination of the Agreement without engaging in federal trademark infringement, and/or unfair competition under the Lanham Act, because DDC has abandoned the Trademark generally, or specifically through "naked licensing."

78.    DDC reserved no right to control quality under the Agreement.   DDC otherwise exercised no quality control after inception of the Agreement, in part because IRS was a shell or "sham" corporation that did not exist as a practical matter.

79.    Kendall has retained undersigned counsel and is obligated to pay reasonable attorneys' fees for the legal services rendered in this action.

80.    Under the Agreement, "[a]ny action to enforce, arising out of, or relating in any way to, any of the provisions of this Agreement, the prevailing party shall, in addition to any other relief, be entitled to recover reasonable attorney's fees and costs."

81.    A bona fide and actual case, controversy, and dispute is present as to the parties rights under the Agreement and the Lanham Act, as to:

    a.  Whether Kendall is the assignee of the Trademark as a matter of federal law;

    b.  Whether Kendall may lawfully sell Dri-Dek after termination of the Agreement without engaging in trademark infringement, and/or Federal

unfair competition under the Lanham Act, due to DDC's abandonment of the Trademark.

WHEREFORE Plaintiff, Products by Kendall, Inc., requests entry of judgment by this Court declaring that:

a. Kendall has lawfully terminated the Agreement; and

b. Kendall was assigned the Trademark by grant of rights to perpetual use, exclusive use, world-wide use, and rights to transfer the Trademark; and/or

c. Kendall may lawfully sell Dri-Dek after the termination of the Agreement without engaging in trademark infringement, and/or Federal unfair competition under the Lanham Act, because DDC has abandoned the Trademark generally, or specifically through naked licensing;

d. Awarding attorneys' fees and costs incurred by Kendall in bringing this action; and

e. All other and further relief that the Court deems just and proper.

## COUNT III – CYBERSQUATING PURSUANT TO 15 U.S.C.A. § 1125(d)
### *(Products by Kendall, Inc., v. Quest for Collier County, Inc., Quest Foundation, Inc.)*

82. This count sets forth action for Cybersquatting Pursuant to 15 U.S.C.A. § 1125(d) arising from, *inter alia*, the registration and/or use, of the internet domain names, "dri-deck.com," "dry-dek.com," "dry-deck.com," and/or "dri-deck.info" (collectively the "Similar Domain Names") by Defendants, Quest, and Quest Foundation in interstate commerce within the United States, and specifically in this Middle District of Florida.

83. Kendall re-alleges and incorporates by reference paragraphs 1 through 59 of this Complaint as fully set forth in this paragraph.

84.    Kendall has standing to assert a claim for Cybersquatting as the assignee and owner, or alternatively, as the exclusive licensee of the Trademark for Dri-Dek and the domain name "www.dri-dek.com."

85.    The Trademark for Dri-Dek is a distinctive and famous mark, and was a distinctive and famous mark at the time the domain name "www.dri-dek.com" was registered, and at all other times relevant to this action, pursuant to Section 3002(a) of the Anticybersquatting Act, 15 U.S.C.A. § 1125(d)(1).

86.    The Similar Domain Names were initially deliberately redirected to "www.dri-dek.com" specifically because they were confusingly similar to "www.dri-dek.com."

87.    Quest and Quest Foundation have registered and/or use the Similar Domain Names with bad faith intent to extort monies from Kendall as part of separate unrelated litigation, and with bad faith intent to direct consumers and profits away from Kendall without the prior knowledge, permission, or consent of Kendall.  Such actions are a violation of Section 3002(a) of the Anticybersquatting Act, 15 U.S.C.A. §§ 1125(d)(1)(A)(ii)(I), (II); (d)(1)(B)(i)(II), (VI); and (d)(1)(E).

88.    Kendall is therefore entitled to a judgment from this Court compelling Quest and Quest Foundation, and each of them, to transfer all control and rights to the Similar Domain Names to Kendall, pursuant to Section 3002(a) of the Anticybersquatting Act, 15 U.S.C.A. § 1125(d)(1)(C).

89.    Kendall is further entitled to a preliminary and permanent injunction enjoining Quest and Quest Foundation from any use of the Similar Domain Names pursuant to Section 3003 of the Anticybersquatting Act, 15 U.S.C.A. § 1116(a).

90. Kendall will suffer irreparable injury that is not susceptible of ascertainment or reduction to damages, as it is constantly occurring, and will apparently occur in the future.

91. Kendall is further entitled to a judgment from this Court awarding Kendall all actual damages proximately caused by Quest and/or Quest Foundation, or, in the alternative, statutory damages of not less than $1,000 and not more than $100,000, as the court considers just, pursuant to Section 3003(b) of the Anticybersquatting Act, 15 U.S.C.A. § 1117(a), (d).

WHEREFORE, Plaintiff, Products by Kendall, Inc., prays:

    i.     For an order of this Court compelling the Defendants, Quest for Collier County, Inc., and Quest Educational Foundation, Inc., and each of them, to transfer all control and rights in the Similar Domain Names to Kendall;

    ii.     For a preliminary and permanent injunction enjoining Defendants, Quest for Collier County, Inc., and Quest Educational Foundation, Inc., from further use of the Similar Domain Names;

    iii.     For an accounting setting forth all revenues, profits, and internet traffic received by the Defendants, Quest for Collier County, Inc., and Quest Educational Foundation, Inc., and each of them, in connection with their use of Similar Domain Names;

    iv.     For general and special damages against the Defendants, Quest for Collier County, Inc., and Quest Educational Foundation, Inc., and each of them, jointly and severally, according to proof at the time of trial or, in the alternative, for statutory damages in an amount not less than $1,000, nor in excess of $100,000;

v.     Interest, attorney's fees, and costs incurred in bringing this action; and

vi.    All other and further relief that this Court deems just and proper.

## COUNT IV - TORTIOUS INTERFERENCE WITH CONTRACT
### *(Products by Kendall, Inc. v. Quest for Collier County, Quest Educational Foundation)*

92.    This is an action for tortious interference with contract.

93.    On or about April 1, 2001, Kendall and DDC entered the Agreement and thereby contracted to transfer ownership to Kendall and/or exclusive use by Kendall of "dri-deck.com," "dry-dek.com," "dry-deck.com," and/or "dri-deck.info" (collectively the "Similar Domain Names").

94.    Because the principal(s) of DDC, Quest, and Quest Foundation are the same or substantially overlap, Quest and Quest Foundation have been aware of the existence of the Agreement at all times.

95.    Defendants, Quest, and Quest Foundation have intentionally interfered with the Agreement at least by registration, use, and/or conversion of the Similar Domain Names with bad faith intent to extort monies from Kendall, and with the bad faith intent to direct customers and profits away from Kendall without the prior knowledge, permission, or consent of Kendall.

96.    Kendall has been damaged by Quest and Quest Foundation's interference with the Agreement by loss of revenues, and the loss value of marketing contacts with customers, without limitation.

97.    Because Quest and Quest Foundation have utterly no legitimate business interest in registering or using the Similar Domain Names, Quest and Quest Foundations actions set forth herein were necessarily undertaken with malice.

WHEREFORE Plaintiff, Products by Kendall, Inc., requests entry of judgment against Quest and Quest Foundation awarding damages, interest, and any other and further relief that the Court deems just and proper.  Plaintiff, Products by Kendall, Inc., reserves the right to seek and pray for an award punitive damages upon leave of Court.

### COUNT V – FRAUDULENT INDUCEMENT
*(Products by Kendall, Inc. v. Dri-Dek Corporation)*

98.     This count sets forth an action for fraudulent inducement.

99.     Kendall re-alleges and incorporates by reference paragraphs 1 through 59 of this Complaint as fully set forth in this paragraph.

100.     In March of 2001, and at other times, DDC falsely represented that IRS had legitimately assumed responsibility for maintenance of the mold tooling for Dr-Dek.

101.     In March of 2001, and at other times, DDC falsely represented that DDC "owed" and "paid" significant and sizable expenses for maintenance of the mold tooling for Dri-Dek, and for assumption products liability for Dri-Dek.

102.     In March of 2001, and at other times, DDC falsely represented that DDC and IRS then intended to maintain the mold tooling for Dri-Dek.

103.     DDC knew at all times that IRS was not a legitimate and operational company but that the relationship between DDC and IRS was actually and unequivocally "**a sham**." See *Exhibit D*.  (Emphasis in the original.)

104.     DDC knew at all times that IRS was fully under the common ownership of Dekko, such that Dekko actually paid himself, and DDC "owed" and "paid" no money to IRS as a practical matter.

105.   DDC knew at all times that IRS did not, and could not, maintain the mold tooling for Dri-Dek, because IRS did not exist as a practical matter or had no meaningful operations.

106.   DDC intended for Kendall to rely on the above misrepresentation in inducing Kendall to remunerate and pay DDC under the Agreement for amounts DDC falsely alleged that it "owed" and "paid" to IRSystems, LTD., for maintenance of the mold tooling for Dri-Dek, and for assumption of products liability, both of which were fictitious and false.

107.   Kendall relied on the above misrepresentations in entering the Agreement, and in substantial part by agreeing to the specific amounts paid on per-piece for the manufacture of Dri-Dek.

108.   Kendall has incurred damages as a direct result of its reliance on the above-referenced misrepresentations, at least by compensating and paying DDC for the benefit of services and consideration that DDC did not actually provide or obtain to Kendall through IRS, and that did not in fact exist.  Kendall is entitled to damages at least in the amount of payments made to DDC, less value of any goods, services, or consideration actually furnished through IRS.

WHEREFORE Plaintiff, Products by Kendall, Inc., requests entry of judgment against Dri-Dek Corporation awarding damages, interest, and any other and further relief that the Court deems just and proper.  Plaintiff, Products by Kendall, Inc., reserves the right to seek and pray for an award punitive damages upon leave of Court.

Respectfully submitted on this 30th day of April, 2013.

**ALLEN DELL, P.A.**

Patrick A. Traber, Esq.
Florida Bar No: 0015802
ptraber@allendell.com
Kevin L. Dees, Esq.
Florida Bar No: 0015959
kdees@allendell.com
ALLEN DELL, P.A.
202 South Rome Avenue
Suite 100
Tampa, Florida  33606
Telephone: (813) 223-5351
Facsimile:  (813) 229-6682
Counsel for Plaintiff, Products by Kendall, Inc.